RECEIVED
NOV 3 0 2005
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

FILED
JAN - 3 2006
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **DARLIE LYNN ROUTIER,** | § | **SA05CA1156 RF** |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | NO. _____ |
| **- v-** | § | |
| | § | |
| | § | |
| **DOUGLAS DRETKE, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | **CAPITAL CASE** |
| **Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

# PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

/2.

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   JURISDICTION .................................................................................. 2

III.  STATEMENT OF FACTS ................................................................... 2

     A.    The Attack ................................................................................ 3

     B.    The Identity Of The Assailant ................................................. 5

     C.    Trial ......................................................................................... 6

          1.    The State's "Staged" Crime Scene Theory ................... 7

          2.    The State's Trial-By-Character-Assassination Strategy ............. 12

          3.    Evidence That Was Available, But Never Presented, Due to Trial Counsel's Failure To Investigate And Prepare The Defense ................................................. 15

IV.  PROCEDURAL HISTORY ............................................................... 21

     A.    Trial Court ............................................................................. 21

     B.    Direct Appeal ........................................................................ 21

     C.    State Habeas Corpus Petition ................................................ 22

     D.    Petitioner Will Request a Stay of These Proceedings Until the State Courts Resolve Her Pending DNA Testing Motions ..................... 23

V.   CLAIMS FOR RELIEF ................................................................... 24

     A.    Darlie Routier Was Denied Her Sixth Amendment Right To Effective Assistance Of Counsel. ......................................... 24

          1.    Trial Counsel's Divided Loyalties Between Darlie Routier And Her Husband Constituted Ineffective Assistance Of Counsel. ............................................... 24

              a) Relevant Facts ..................................................... 24

              b) Legal Basis For The Claim ................................. 28

i

c) This Error Is Not Harmless ........................................29

2. Defense Counsel's Failure To Investigate And Rebut Physical Evidence That Lay At The Center Of The State's Case Constituted Ineffective Assistance Of Counsel. ...............................................................29

a) Relevant Facts .................................................29

b) Legal Basis For The Claim. ...............................37

3. Defense Counsel's Failure To Investigate Darlie Routier's Husband Constitutes Ineffective Assistance Of Counsel. ...............................................................39

4. Trial Counsel's Failure To Object To Character Assassination And Use Of Inadmissible Expert Testimony Constitutes Ineffective Assistance Of Counsel ................................................................42

B. The Routier Trial Was So Infected With Unfairness That Ms. Routier Was Denied Her Fourteenth Amendment Rights To Due Process. ...............................................................42

1. Relevant Facts.......................................................42

a) The State's Tactic Of Character Assassination Inflamed The Passions Of The Jury And Unfairly Prejudiced Ms. Routier.......................42

b) Repeated Use Of Inadmissible Medical "Expert" Testimony Substantially Prejudiced Ms. Routier. .............................................................44

c) Repeated Use of Inadmissible "Expert" Testimony On Crime Scene Analysis Substantially Prejudiced Ms. Routier. ...............................46

2. Legal Basis For The Claim .......................................47

3. Ms. Routier Was Deprived Of A Fair Trial .................48

C. The Cumulative Impact Of The Ineffective Assistance Of Counsel And the Fundamental Unfairness Of The Trial Violated Ms. Routier's Due Process Rights. ............................48

1. Relevant Facts.......................................................49

        2.     Legal Basis For The Claim ......................................................50

    D.    Darlie Routier Is Innocent of the Crime For Which She Was
            Convicted. ..................................................................................50

        1.     Ms. Routier Has Introduced Evidence of Actual
                  Innocence That Exceeds the Gateway Standard Under
                  *Schlup v. Delo* and Is Therefore Entitled To Relief For
                  The Specific Constitutional Violations In Her Case...................50

        2.     The Supreme Court's Pending Review of *House v. Bell*
                  May Afford Ms. Routier With a Freestanding Claim of
                  Actual Innocence. ......................................................................53

VI.    ISSUES UNDER 28 U.S.C. §§ 2254 (d)(1), (d)(2), (e)(1) WITH
       RESPECT TO THE STATE COURT'S FINDINGS OF FACT AND
       ADJUDICATION OF THE CLAIMS ..............................................54

VII.   PRAYER FOR RELIEF..................................................................55

## I.   INTRODUCTION

Darlie Lynn Routier sits on Texas death row for a crime she did not commit. On the morning of June 6, 1996, an intruder broke into Ms. Routier's household, where she slept on the living room couch. Her two oldest boys – Devon, 6, and Damon, 5 – slept near her on the living room floor. Ms. Routier's husband, Darin, and their baby boy slept upstairs in the master bedroom. The intruder attacked Ms. Routier, Devon, and Damon, brutally stabbed the two boys, and sliced Ms. Routier's throat. Both Devon and Damon died as a result of their injuries. Ms. Routier survived, but the State charged her with her sons' deaths. A jury convicted Ms. Routier of Damon's murder after the prosecution urged jurors to conclude from circumstantial evidence that she murdered her own sons, inflicted her own wounds, and constructed an elaborately-staged crime scene to make it appear as if a third party had broken in.

Ms. Routier has consistently maintained her innocence. Her conviction at trial turned on the State's presentation of circumstantial evidence, inaccurate expert testimony, and inflammatory character evidence that should not have been admitted. The evidence so infected Ms. Routier's trial with unfairness as to deprive her of her right to due process. In addition, Ms. Routier's trial counsel failed, among other things, to conduct an investigation of her husband, the only other adult known to be in the house the morning of the murders; represented Ms. Routier's husband in a separate gag order proceeding, and then agreed not to implicate her husband in the defense of Ms. Routier; and dismissed forensic experts Bart Epstein and Terry Laber _after_ they reached preliminary conclusions that Ms. Routier was innocent, and then failed to present any scientific experts in rebuttal of the State's circumstantial case.

In Ms. Routier's state habeas proceeding, she filed seven motions for access to forensic and biological evidence in the State's possession to support her innocence claim. The Texas court refused to hold any hearings and did not rule for over two years. The court finally denied Ms. Routier's attempts to gain access to this evidence when it denied her state habeas petition. The court engaged in no independent factfinding and categorically endorsed the State's erroneous version of the facts. Thus, the state court's conclusions are entitled to no deference. Nor has the state court ruled on Ms. Routier's efforts to obtain DNA testing under Texas law, filed in November 2003. Because these DNA proceedings are still pending, Ms. Routier will ask this Court to hold her petition in abeyance while she exhausts her remaining state court remedies. Ms. Routier will also exercise her right to seek discovery in federal court.

## II.   JURISDICTION

This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 2241(d). Ms. Routier was indicted for the offense of capital murder in the District Court of Dallas County, Texas. Venue was changed for trial to Kerr County, Texas, which is in the Western District of Texas, San Antonio Division. Petitioner is in the custody of the Texas Department of Criminal Justice pursuant to the judgment and death sentence. Under 28 U.S.C. § 2244(d)(1), a petition filed on or before December 1, 2005, is timely.

## III.   STATEMENT OF FACTS

In the early-morning hours of June 6, 1996, six-year-old Devon Routier and his five-year-old brother, Damon, were stabbed and killed in the living room of their home in Rowlett, Texas. Devon and Damon's mother, Darlie Lynn Routier, was seriously injured in the same brutal attack, suffering multiple knife wounds including a cut across her neck

2

that came within millimeters of fatally severing her carotid artery. The immediate aftermath of that assault is captured on the tape of Darlie's phone call to 911, which recorded Darlie's terrified voice saying that an unknown intruder had stabbed her and her sons before exiting through the garage. But the investigators who arrived at the house that night almost immediately decided that it was Darlie herself who had murdered her children, and that her near-fatal wounds were only part of an effort to stage the crime scene. The police and, later, the prosecution never wavered from this snap judgment, despite substantial and compelling evidence that an unidentified intruder had in fact been present at the time of the killings, including bloody fingerprints inside the house that do not match any member of the family, as well as a sock bearing the blood and DNA of all three victims, which was found three houses away in the alley behind the Routier home.

## A.   The Attack

Like many victims of violent crime, Darlie does not remember many details from the attack. Darlie, Devon, and Damon had fallen asleep in the family room, where they had earlier been watching television. C.R.R. Vol. 44, p. 4865:9-21.[1] Darlie's husband, Darin Routier, was sleeping upstairs in the couple's bedroom with their youngest son, 8-month-old Drake. As recounted in her trial testimony, Darlie recalls being awakened by Damon hitting her right shoulder and saying "Mommy," then seeing a man walk from the family room couch into the kitchen. C.R.R. Vol. 44, p. 4867:24-4868:16. Darlie got up from the couch, then heard the sound of breaking glass. C.R.R. Vol. 44, p. 4868:11-12. Darlie motioned for Damon to stay behind her, then followed the man into the kitchen and saw him going into the utility room. C.R.R. Vol. 44, p. 4868:12-16. Darlie turned

---

[1]   C.R.R. refers to the "Corrected" Reporter's Record, adopted on September 7, 2000.

3

on the lights in the kitchen, then realized there was blood on her.  C.R.R. Vol. 44, p. 4869:2-5, 9-12.  Walking further, she saw a knife lying on the floor inside the entrance of the utility room  C.R.R. Vol. 44, p. 4869:13-17.  Darlie picked up the knife and placed it on the kitchen counter, then saw that Devon had been stabbed and was lying motionless on the floor of the family room.  C.R.R. Vol. 44, p. 4869:18-4870:2.

Darlie screamed out Devon's name, then turned to see Damon, who was still standing.  C.R.R. Vol. 44, p. 4870:4-7.  Seeing that Damon too had been stabbed, Darlie screamed out for her husband, Darin.  C.R.R. Vol. 44, p. 4870:10-20.  Darin came downstairs and began trying to help Devon, performing CPR.  C.R.R. Vol. 44, p. 4870:16, 4872:25-4873:5.  Meanwhile, Darlie got towels from the kitchen to try and stop the boys' bleeding, and grabbed the phone to call 911.  C.R.R. Vol. 44, p. 4870:16-4872:1.  Darlie put a towel on Damon's back and told him to hold on, to which Damon responded with his final words, "Okay, Mommy."  C.R.R. Vol. 44, p. 4872:4-9, 19-22.  Darlie then moved over to Devon, who was losing blood through his chest wounds every time Darin blew into his son's mouth.  C.R.R. Vol. 44, p. 4872:25-4873:5.  After placing another towel on top of Devon's chest wound, Darlie ran outside and screamed across the street for help from a neighbor who was a nurse, then ran back and forth to the kitchen sink for more towels to stop her sons' bleeding.  C.R.R. Vol. 44, p. 4873:7-4874:5.  All of this occurred while Darlie was on the phone with the 911 dispatcher.  C.R.R. Vol. 44, p. 4876:1-14.

When the first police officer arrived at the scene, Darlie was dizzy and using a vacuum cleaner as a crutch to steady herself.  C.R.R. Vol. 44, p. 4874:18-4875:2.  Darlie had only realized that she had also been injured in the attack when she saw her neck

wound in a mirror, although she did not know how badly she had been wounded. C.R.R. Vol. 44, p. 4875:3-20. The officer told Darlie to lay down. C.R.R. Vol. 44, p. 4876:17-24. The paramedics then arrived at the scene and began tending to the two boys. The paramedics first took Damon away, then brought Darlie out to the front porch. C.R.R. Vol. 44, p. 4878:10-25. After the paramedics bandaged Darlie's neck and arm wounds, they transported her to Baylor Hospital in Dallas, where she underwent surgery to explore and close her wounds. C.R.R. Vol. 44, p. 4880:21-4881:7; C.R.R. Vol. 30, pp. 719:19-729:15; *see* Exhibit 1 (State's Trial Exhibit 52-G). The surgery revealed that the slash wound across Darlie's throat had penetrated all the way to, but not through, the sheath of her carotid artery. C.R.R. Vol. 30, p. 795-96; *see* Exhibit 2 (Defendant's Trial Exhibit 90). Thus, if the wound had been only two millimeters longer, Darlie would have bled to death within two to three minutes. C.R.R. Vol. 30, p. 795-96. Darlie also suffered severe bruising on both arms that did not fully manifest itself until after the attack. *See* Exhibit 3 (State's Trial Exhibit 52-E).

Devon died at the scene. C.R.R. Vol. 32, p. 1477-78. Damon was pronounced dead on arrival at the hospital. C.R.R. Vol. 30, p. 716:3-7. Drake, the infant who had been sleeping upstairs with his father, is today ten years old. Darlie was convicted of capital murder and sentenced to death.

## B.  The Identity Of The Assailant

In front of the jury, the prosecution neatly summarized the central issue in the case as follows:

> The only issue is who did it?  Identity.  And it comes down to this: It's either going to be some unknown intruder who came into the house and committed a horrible murder or it's going to be the defendant.

C.R.R. Vol. 46, pp. 5212:23-5213:2.  Even before being taken to the hospital by the paramedics, Darlie had described the man she saw leaving through the kitchen – whom she saw only from behind – as having long hair and wearing a baseball cap, a dark t-shirt, and jeans.  C.R.R. Vol. 44, pp. 4882:18-4883:25.

The investigators quickly disregarded Darlie's description of the attack.  James Cron, a retired Rowlett police officer who examined the crime scene that night, testified that he formed a belief that there had been no intruder after his initial walk-through of the scene, which lasted only 25-30 minutes  C.R.R. Vol. 34, pp. 2196:6-9.  When asked by the prosecutor why he formed this opinion after his initial walk-through, Cron mused that "It's sort of a big picture.  It's not any one thing.  It was the overall scene which, primarily, is the lack of evidence in many cases.  But the entire scene indicated to me there had not been an intruder.  There wasn't any one object or any one situation there." C.R.R. Vol. 34, pp. 2197: 4-14.  In accordance with this testimony, the State simply disregarded Darlie's account and sought to portray the entire murder scene, as well as Darlie's own injuries, as an elaborate attempt to stage the scene and cover up Darlie's alleged responsibility for the deaths of her sons.

**C.    Trial**

After jury selection, Darlie's trial commenced in Kerrville, Texas on January 6, 1997 – exactly seven months after the murders of Damon and Devon.  The State's case against Darlie was entirely circumstantial, built primarily upon character evidence that Darlie was a materialistic woman who lived beyond her means, and upon the testimony of so-called expert witnesses who testified that the physical evidence at the crime scene suggested that it had been staged.  Indeed, the State sought to explain nearly every

6

element of the chaotic, blood-soaked crime scene as evidence of staging and, therefore, Darlie's guilt.

### 1.    The State's "Staged" Crime Scene Theory

One of the key items of trial evidence was Darlie's blood-soaked nightshirt, which she was wearing at the time of the attacks.  *See* Exhibit 4 (State's Trial Exhibit 120).  Prosecution witness Tom Bevel testified that blood spatter on the back of the nightshirt was consistent with "cast off" stains that would have been deposited when she brought the knife overhead in a stabbing motion:

> Taking a knife that was the same diameter of the knife in question, I just simply, in this case I went down to my knee after placing a clean T-shirt on my body, put blood on the knife, on both sides, again, held it up and allowed it to just simply stop its dripping . . . .  And then just simply did a motion such at this, I think on the first time I did it with two swings, if you would, without adding any additional blood, to see if in fact we get the blood that would be on the back that would be consistent in size, direction, location as the blood in question on the T-shirt [worn by Darlie on the night of the attack].

C.R.R. Vol. 39, p. 3357:10-3358:1.  He explained the significance of his findings to the jury by saying "I was able, multiple times, to get bloodstains that were the same size, location, with the long axis up and down in that area and on other areas of the back of the [test] shirt."  C.R.R. Vol. 39, p. 3358:3-6.  Thus, the State sought to establish through Bevel's testimony a direct, physical link between Darlie and the stabbing of her children.

But Bevel also conceded that the tiny stains he described as "cast-off" on Darlie's nightshirt – which supposedly came off of the knife when Darlie was stabbing her children – contained the blood of both Darlie *and* the boys.  C.R.R. Vol. 39, pp. 3344:17-3346:8.  If Darlie had stabbed her children, this mixture could only be explained in one of two ways.  Either the knife itself had a mixture of Darlie and her sons' blood on it at the time she was stabbing her children – which was impossible under the State's theory of a

7

staged crime scene and Darlie's self-infliction of her own wounds after attacking the boys – or millimeter-sized drops of Darlie's own blood must have miraculously landed directly on top of the boys' own millimeter-sized drops of blood.  C.R.R. Vol. 39, pp. 3354:9-11, 3488:14-21, 3490:23-3491:5, 3547:20-3549:8.  Either explanation defeats the State's theory.

Another key element of the State's staging theory was a broken wine glass on the floor of the Routier kitchen, in the middle of the intruder's exit path.  Prosecution witness James Cron testified that a glass from a wine rack in the Routiers' kitchen had been deliberately thrown to the floor to suggest a struggle:

> Q.      While you were telling us what a rocket scientist could and couldn't do, let me just ask you how you decided, that the wine glass was broken?
>
> *        *        *
>
> A.      When I make my – walking through the kitchen the first time, I had no earthly idea.  I thought, well, maybe it was broken during the scuffle with the intruder.  After I finished the walk-through and went outside and came back inside, it looked to me like it had been broken there to simulate or stage an offense, a member of the household broke it and planted it there.
>
> *        *        *
>
> A.       After I made the initial walk-through, where I first went through, I didn't think anything of it.  I thought it was broken maybe in a scuffle.
>
> *        *        *
>
> A.      After I went back outside the house, finishing all of the inside, going outside then coming back in, I based my opinion . . . that there was – no intruder and I could only conclude that the glass was broken as part of the staging of this offense to make it appear like there had been an intruder.

C.R.R. Vol. 35, pp. 2391:5-2392:5.

8

Prosecution witness Tom Bevel testified that a Hoover vacuum cleaner that police officers discovered knocked over actually had been rolled through blood, as indicated by wheel marks on the flooring, and was another effort to stage the crime scene:

> A.      It is a motion just simply of the wheel rolling through the bloodstain. However, they are not connected. You then have another area and you would just about have to lift the vacuum cleaner and go over to another area and then proceed to roll again in a different direction from the original location or – and original direction.
>
> Q.      Okay. So there were differing directions to these movements; is that right?
>
> A.      As well as not being connected, so there has to be some movement up from off of the floor with the vacuum cleaner.
>
> Q.      The roll marks that you saw on the floor, sir, were they consistent with the State's Exhibit No. 93 just simply being dumped over or knocked over in one motion?
>
> A.      They would not, no, sir.

C.R.R. Vol. 38, pp. 3310:13-3311:4.

Another prosecution expert, Charles Linch, testified that a single fiber recovered from "Knife Number 4" – a bread knife that the State alleged Darlie used to cut a window screen in the garage to make it appear an intruder had gone through the window – was consistent with the material from a torn garage window screen:

> Q.      Bottom line, from this comparison of the black rubbery material and the glass rods on the window screen and on this knife, what does that say to you as a trace evidence analyst?
>
> A.      I couldn't tell the difference between this debris and the debris found on the knife and, therefore, this knife could have been used to cause the cut, defect.

C.R.R. Vol. 37, p. 2926:1-24.

In its closing arguments, the State explained how these witnesses' testimony of a staged crime scene supported the theory that Darlie had murdered her sons:

9

Well, it doesn't take Sherlock Holmes to figure out, that this vacuum cleaner was dumped on top of those bloody footprints after it was moved. But why? If the defendant did it, it's because it's staging. You need to show some type of struggle occurred, something like that.

But what else didn't make sense to Mr. Cron? The wine glass. Supposedly ran into this -- this intruder ran into this wine rack somehow and broke a glass. Well, there's glass on top of the bloody footprints, and the officer said they were careful not to step on blood, and not to step on glass. The trouble is he checked the wine rack and it was real sturdy.

That is another indication that something wasn't adding up . . . with this story . . . .

And when [Charles Linch] tested [] that bread knife, he looked at it under the microscope and what did he find? Glass rods, the same type of rubber material seen on the bread knife. And that same type of rubber debris with the glass meshed in. The same type of stuff that happens when you cut the screen. And it adds up, that bread knife was used to cut that screen, and . . . that tells you they were trying to fake the crime scene. . . .

And the defense asked [Tom Bevel] [how Darlie's blood could be mixed with the boys' blood on the tiny stains on her nightshirt,] but the most consistent way it could happen is when the stabbing motion comes up and the knife is over the shoulder. He simulated it in tests and found the same size of the spot on his own T-shirt. That tells you that she was stabbing, and Devon's blood winds up on her back. It's not going to wind up there if she is laying on the couch as a man wrestles at her neck.

C.R.R. Vol. 47, pp. 5224:25-5225:14, 5225:22-23, 5229:16-24, 5233:9-16.

The prosecution even managed to incorporate a key piece of evidence, found

some seventy-five yards away from the Routier home, into the staged crime scene theory

that it crafted. That item of evidence was a blood-stained sock found by the police in the

alley several houses away from the Routier home, which contained the blood of both

Damon and Devon, as well as a faint result of DNA from Darlie and several unidentified

limb hairs. C.R.R. Vol. 32, pp. 1260:1-1266:2; C.R.R. Vol. 38, pp. 3144:4-3146:18. The

State's explanation for the location of this sock was simply that Darlie must have planted

it there as part of her staging of the crime scene, after the boys had been stabbed but –

10

since none of her blood was found anywhere between the Routier house and the location of the sock – before she supposedly inflicted her own wounds.

The State's theory was physically impossible, however, given the testimony of the State's pathologist that Damon could not have lived for more than nine minutes after being stabbed. C.R.R. Vol. 28, p. 138. The 911 recording lasted 5 minutes and 44 seconds, and it was at least another 1 minute and 10 seconds before the paramedic saw Damon take his last breath. C.R.R. Vol. 30, p. 677; C.R.R. Vol. 32, pp. 1427-28, 1432-33. This would have left only two minutes and six seconds for Darlie to, among other things, leave the house with the sock wearing nothing but a night shirt; run on concrete in her bare feet to the back gate; kick the broken gate open with her bare foot; run the length of three houses; drop the sock; return to the back gate; close the back gate and enter the house; pick up the butcher knife in her right hand; cut her throat, shoulder and cheek without turning on a light; switch the knife to her left hand and cut her right forearm and fingers of her right hand; put the knife with her blood on it down on the carpet near the couch in the family room; move the knife to the kitchen counter; turn on the kitchen light switch with a bloody hand; rush to the utility room and touch the door to the garage with a bloody hand; break a wine glass so that pieces of it landed on top of her blood; grab the vacuum cleaner with a bloody hand; roll it through her blood in the kitchen, lift it off the floor and roll it through her blood again; knock the vacuum over on top of her blood and the broken glass; scream for Darin and wait for him to rush downstairs; and pick up the telephone and dial 911. C.R.R. at Vol. 28, pp. 91-2; C.R.R. Vol. 29, pp. 476-7, 483-4; C.R.R. Vol. 30, pp. 725-28; C.R.R. Vol. 33, pp. 1617-18, 1730; C.R.R. Vol.34, p. 2170; C.R.R. Vol. 35, pp. 2281-2; C.R.R. Vol. 38, p. 3300; C.R.R. Vol. 39, pp. 3331-2, 3398-9,

3485; C.R.R. Vol. 40, pp. 3661, 3681-2, 3749-54; C.R.R. Vol. 42, p. 4334; C.R.R. Vol.

43, pp. 4548-50, 4571-3; C.R.R. Vol. 51, p. 5886; C.R.R. Vol. 52, p. 6033; C.R.R. Vol.

52, p. 6048; RR.52, p. 6053.

 Thus, the only possible explanation for the presence of the sock in the alley was

that it had been dropped there by a fleeing assailant.

### 2. The State's Trial-By-Character-Assassination Strategy

 To bolster its circumstantial evidence of a supposedly staged crime scene, the

State relied on a strategy of character assassination, seeking to prove that Darlie was the

type of person who would kill her own children.  Indeed, the State's trial-by-character-

assassination started with the second paragraph of its opening statement, when the

prosecution told the jury that "the real Darlie Routier is, in fact, a self-centered woman, a

materialistic woman, and *a woman cold enough, in fact, to murder her own two*

*children*." C.R.R. Vol. 28, pp. 31:23-32:1 (emphasis added).

 The trial record is replete with character evidence offered and admitted for the

purpose of showing Darlie's supposed propensity to murder her own sons.  The following

is only a partial list of the evidence and testimony elicited by the State to attack Darlie's

character and portray her as the type of person who would kill her own children:

- Barbara Jovell, a long-time acquaintance of Darlie, provided specific examples as to how, in her opinion, Darlie became more "materialistic" over the years. C.R.R. Vol. 36, p. 2539:4-16.

- Jovell was allowed to testify that Darlie had a temper and was the dominant personality vis-à-vis her husband. C.R.R. Vol. 36, p. 2547:10-17.  Jovell was then permitted to describe specific examples of Darlie's temper in response to the prosecutor's question, "what kind of things would get her mad," to which Jovell replied "mostly money." C.R.R. Vol. 36,  p. 2548:7-16.

- The prosecutor intentionally disregarded the motion in limine granted by the trial judge and asked Darin Routier about the fact that Darlie had breast implants. C.R.R. Vol. 42, p. 4348:11-14.

- The pastor who presided over the funeral of the slain children was asked irrelevant questions about whether pocket-knives and tarot cars were placed in the casket with the boys, and whether the song "Gangster's Paradise" was played at the funeral. C.R.R. Vol. 40, pp. 3857:13-3858:1.

- The prosecutor asked a Routier neighbor, Karen Neal, wholly irrelevant questions about the lyrics to "Gangster's Paradise." Defense counsel offered no objection to admissions of the irrelevant lyrics to this song through this neighbor, and even went so far as to flippantly state in front of the jury, "We have no objection, if he'll sing it." C.R.R. Vol. 41, pp. 3979:17-3980:13.

- On cross examination of Luann Black, the prosecutor questioned her about the appropriateness of the lyrics to "Gangster's Paradise," the first song played at the children's funeral. Even though the witness proclaimed not to know what the song was about, the prosecution was allowed to ask, "so you are not aware that it is about violent crimes?" C.R.R. Vol. 41, pp. 3979:17-3980:13. The prosecutor also was allowed to question Darlie's parenting when he asked, "You mean that she let her five and six year old children listen to 'Gangster's Paradise' by Coolio?" C.R.R. Vol. 41, pp. 3979:17-3980:13.

- On cross examination of Darin Routier, the prosecution was allowed to go line-by-line through the inflammatory and irrelevant lyrics of "Gangster's Paradise." C.R.R. Vol. 43, pp. 4482:6-4484:8.

- The prosecutor asked Darin Routier about the fact that he and Darlie bought jewelry at pawn shops and even took the children to these pawn shops on occasion. C.R.R. Vol. 43, pp. 4479:16-4480:5.

- The prosecutor pointed out during Darlie's cross-examination that she did not take her children to church regularly. C.R.R. Vol. 44, p. 4917:11-13.

- The prosecutor questioned Darlie about her tradition of going out with her girlfriends on the night before Mother's Day. C.R.R. Vol. 44, pp. 4914:8-4915:8.

- The prosecution, in order to establish that Darlie was materialistic, repeatedly emphasized the material possessions owned by the Routiers. *See, e.g.*, C.R.R. Vol. 41, pp. 3937:19-3938:4 (questioning by the prosecutor regarding the property the Routiers owned, including a "28 foot boat out there on the lake" and "new, very nice . . . spa in the backyard").

13

- Prosecutors questioned Darin about his conversations with Jamie Johnson, a Child Protective Service worker, about what Darlie had said to him in 1995 about being "sick of everything" and having trouble keeping the house clean and about Darlie being a "cleanaholic." The prosecutor implied through his question that Darin Routier told this individual, "[i]t's kind of an obsession. She will clean and clean, but the kids would be right behind her making bigger messes." C.R.R. Vol. 42, pp. 4341-4344.

- Witnesses with very limited access to Darlie were allowed to testify about her allegedly cold attitude toward Drake, her infant son, after the crime occurred, without establishing any relevance of this attitude to the murders. For example, nurses who attended to Darlie were allowed to testify that, even though she was fitted with IV tubes and had wounds to her neck, she would not hold Drake while she was in the hospital. *See, e.g.*, C.R.R. Vol. 31, pp. 1032-1033. A paramedic was also permitted to testify that Darlie did not ask about her infant son while the paramedic attended to her. C.R.R. Vol. 32, pp. 1499:20-1500:7.

- Darin Routier was questioned about irrelevant hearsay statements he had made to a radio show host about people getting caught up in materialism and losing sight of what is important, permitting the prosecutor to ask, "That's right. That is something that you all forgot in '96, isn't it? You and the defendant. You got off the track, you got on the material side of life, and you lost sight of your two children for a while, didn't you?" C.R.R. Vol. 42, p. 4363:24.

- Darin was asked to verify hearsay statements that: (1) Darlie told him she was disappointed that Drake was not a girl, C.R.R. Vol. 42, p. 4344:12-15; (2) Darin said "there was no time for me and Mommy to be sexy or run around in the house naked," C.R.R. Vol. 42, p. 4346:20-21; and (3) in May 1996, "a light went on in my head saying she needs help," C.R.R. Vol. 42, p. 4350:4-5.

- The prosecutor told the jury in closing arguments that:

  > You heard from Barbara Jovell, who was this woman's maid of honor, who has known this woman almost 10 years, who had worked with her every day, there at their work place, their one employee. . . . And what did she tell you? It took a lot of guts to get up there. And she told you some facts about the defendant. She loves the defendant. And a few years ago Darlie was a very different person. But their business took off and her attitude started changing. She started thinking about money, and became more self-centered. You know she wears the 10 rings on every finger, all the rings and earrings. She started becoming more self-centered, shopping all the time.

14

Decorating, buying boats, they bought a spa, they bought
new cars, and she is the dominant personality.

C.R.R. Vol. 46, pp. 5236:15-5237:7.

- As to a suicide gesture Darlie allegedly made in May 1996, the prosecutor
  was allowed to argue, "You know, I don't think the defendant was going
  to kill herself. I think she loves herself too much." C.R.R. Vol. 46, p.
  5238:14-16.

- Referring to a videotape that was made of Darlie after the murders at a
  graveside birthday celebration, the State conceded the real reason it had
  offered the video: "*I think it gives you a lot of insight into this woman.
  You see, this is not a picture of a grieving mother, and I don't care how
  many excuses you can come up with, and how many doctors you can bring
  in here and say this is some type of Christian ceremony, or she was on
  some Xanax or people were giving her valiums, no. You can see how she
  is acting. She likes the attention. She is enjoying herself out there. . . .
  She is enjoying it, and it gives you insight into her true character.*"
  C.R.R. Vol. 46, pp. 5238:25-5239:15 (emphases added).

### 3.  Evidence That Was Available, But Never Presented, Due to Trial Counsel's Failure To Investigate And Prepare The Defense

After her arrest, Darlie was initially represented by two court-appointed attorneys,

Douglas Parks and Wayne Huff. Less than three months before trial, however, attorney

Douglas Mulder was hired to replace Parks and Huff as Darlie's defense attorney.

Mulder had already represented both Darin Routier and Darlie's mother, Darlie Kee,

during a show-cause hearing at which the State alleged they had violated a gag-order

regarding the upcoming trial. Mulder had previously informed Darin and Darlie Kee that

Parks and Huff intended to blame Darin for the murders of the two children. *See*

Affidavit of Darlie Kee ("Kee Aff.").[2] When Darin and Darlie Kee learned of this

impending defense, they sought to hire Mulder to defend Darlie in her capital murder

trial. *See* Kee Aff.; Affidavit of Darin Routier ("Routier Aff."). As a condition to

---

[2] All cites to affidavits refer to affidavits filed during the state habeas corpus proceedings.

accepting the representation, Mulder agreed that he would not point the finger at Darin's involvement in the crimes as part of Darlie's defense. *See id.*

During the time that Parks and Huff served as defense counsel, they had retained two forensic scientists, Terry Laber and Barton Epstein, to consult with the defense regarding the physical evidence in the case. *See* Affidavit of Terry Laber at ¶ 5 ("Laber Aff."). Laber and Epstein's preliminary analysis contradicted the State's theory of a staged crime scene. *Id* at ¶ 11. But before Laber and Epstein could complete their work and review of the evidence, Parks and Huff were replaced by Mulder. Mulder held only a brief meeting with Laber regarding the forensic scientists' work on the case, and he did not engage them, or any other forensic experts, to complete a scientific review and testing of the evidence. *Id.* at ¶¶ 7-10. This failure allowed the State to present its theory and its expert witnesses to the jury without sufficient rebuttal by the defense.

Notwithstanding the State's theory of a staged crime scene, however, there was in fact ample evidence that rebutted and contradicted the State's theory, and that demonstrated Damon, Devon, and Darlie had all been attacked by one or more intruders. Due to Mulder's decision to abandon the defense's own forensic examination of the evidence, the jury never heard *any* alternative explanations for evidence such as Darlie's nightshirt, the fiber Charles Linch found on the breadknife, the broken wine glass, and other critical aspects of the State's physical case. The absence of exculpatory forensic evidence was so glaring that the State even went so far as to point out to the jury that defense counsel had presented no scientific evidence to rebut the physical indications of a staged crime scene:

> You know, here is the bottom line on Tom Bevel. You know out there at SWIFS there is another expert, Terry Labor [*sic*]. He is the DNA blood

spatter expert who went out there on behalf of the defendant also, along with Bart Epstein. And if they want to quarrel with Tom Bevel and tell you that he is wrong, and that he is a witch doctor of some sort, where is Terry Labor then?

Where is their blood spatter expert? Don't you know that if he had any criticism of the opinions rendered by Tom Bevel, that just like Bart Epstein, you would see them right up here, and he would be detailing for you what those criticisms are. But he is not here either, is he? And for a very good reason.

There is one other thing that we need to ask also. Where are the samples from the T-shirt taken by Terry Labor? Where are they? You remember those first dibs samples that Terry Labor took from the defendant's T-shirt back in August? Before Tom Bevel even had a chance to look at the T-shirt. Terry Labor, the defendant's expert, went to Dallas and was given an opportunity to take several samples from that T-shirt.

Did you see those samples in courtroom at any point in this trial? No, you didn't. Don't you wonder why? You really don't have to wonder long about that question. It's obvious to you. Why those best samples taken by the defense, why you never saw them, and why you never heard a test result or a DNA result on any of the samples. It speaks volumes to you sometimes what you don't see and hear. And it speaks volumes in this case with regards that T-shirt.

C.R.R. Vol. 46, pp. 5340:3-5341:9. In fact, in October 1996 defense counsel was aware

of contrary evidence. But the jury never heard it.

Laber and Epstein had concluded that Darlies's nightshirt indicated only minimal

areas of blood spatter and that the critical areas of spatter had never been subjected to

genetic testing. Bevel explained to the jury that one explanation for the absence of blood

spatter was that Damon's and Devon's blood was covered by direct hits of Darlie's blood

from her self-inflicted wounds. But in Laber's opinion, that interpretation requires an

extremely unlikely sequence of events. Laber and Epstein recommended *in October*

*1996* that the critical areas of blood staining be tested. *See* Laber Aff. ¶ 12a. But Doug

Mulder ignored that advice, and the jury never heard evidence from such testing.

17

The jury also never learned that before Charles Linch tested Knife Number 4, the kitchen knives recovered from 5801 Eagle Drive already had been dusted for fingerprints using a fiberglass brush composed of a similar material as the fiber removed from that knife. No definitive tests were conducted to determine the source of the fiber. Linch could testify only that the fiber was "consistent" with the garage screen window. *See* C.R.R. Vol. 37, pp. 2862:11-2863:2. Linch had previously reached a similar conclusion about a hair found in the same garage window screen, which he opined was "consistent" with Darlie's hair. *See* C.R.R. Vol. 37 p. 2849:1-6. In fact, DNA testing determined that he was wrong. *See* C.R.R. Vol. 37, pp. 2850:9-14. Laber and Epstein had recommended *in October 1996* that definitive testing be conducted on the fiber. *See* Laber Aff. ¶ 6b. But Mulder again ignored their advice, and the jury never heard evidence from such testing.

Laber and Epstein also concluded that the dispersal pattern of the broken wine glass conflicted with the State's theory that the glass had been dropped to suggest a struggle. *See* Laber Aff. ¶ 11b. Broken glass shards discovered on the wine rack indicated that the glass had broken there. *See id.* Laber and Epstein made that finding *in November 1996. See* id. at ¶ 11. Mulder, however, never presented their finding to the jury.

Laber and Epstein concluded that the pattern of blood spatter on the vacuum cleaner indicated that it had occurred after the vacuum cleaner had been knocked down and, therefore, was not consistent with Bevel's theory that the vacuum cleaner had been pushed around by someone who was bleeding. *See* Laber Aff. ¶ 11a. Laber and Epstein

made that finding *in November 1996. See id.* at ¶ 11.  Once again, however, Mulder never presented their finding to the jury.

Mulder's decision to cut off further forensic investigation also denied the jury the opportunity to properly consider fingerprints that established the presence of an unknown intruder in the Routier home.  One of the most significant items of physical evidence that refutes the State's case is a bloody fingerprint – State's Exhibit 85-J – taken from a glass sofa table between the family room where the attacks occurred and the kitchen through which the intruder had fled.  The person who left that print would have had to leave it while the blood was still wet.  At trial, the State's witness, James Cron, simply testified that he could not make any positive identification of the bloody fingerprint, but that it was "small" and was "consistent with having been left by a five or six year old child." C.R.R. Vol. 35, pp. 2269:24-2270:5.

The State's post-conviction fingerprint expert now concedes that he has excluded, as possible sources of the print, all of the paramedics, police, and other persons who were known to have been at the crime scene between the time the murders were reported and the time the print was collected – except for Darlie.  State's Writ Exhibit 2, at ¶ 3.  Yet an independent fingerprint analyst, working for ABC News, has affirmatively excluded Darlie as the source of Exhibit 85-J, and the renowned forensic anthropologist Richard Jantz has testified by affidavit that the fingerprint is consistent with that of a currently-unidentified adult.  *See* Affidavit of Robert C. Lohnes ("Lohnes Aff."); Affidavit of Richard L. Jantz ("Jantz Aff.").  Obviously, if the print was not made by any member of the Routier family or any of the people who responded to Darlie's 911 call, it had to have been made by an intruder.  Thus, Mulder's failure to investigate the forensic evidence

allowed the prosecution to falsely argue that Exhibit 85-J was irrelevant and unimportant when in reality it proves that an intruder was in the house at the time of the murders and left a bloody fingerprint.

The bloody fingerprint from the sofa table is not the only unidentified fingerprint connected with the murders of Damon and Devon. A second bloody fingerprint was found on the door leading from the Routiers' utility room where Darlie found the knife. *See* Report of Glenn Langenburg (5/5/03).[3] Though not introduced at trial, this second bloody print also bears enough detail to positively exclude a person as its possible source, and Darlie has been excluded as its source. Darlie and Darin have both also been excluded as the source of another patent print on the same door. *See* Report of Glenn Langenburg (5/5/03); Report of Robert Lohnes (6/3/03). Thus, these additional prints were further proof of the presence of an unknown intruder, a fact that could have been shown at trial if Mulder had not shut down the defense's forensic investigation.

The jury that convicted Darlie on February 1, 1997, for the murder of Damon Routier never heard substantial evidence that undermines the State's circumstantial case against her and supports her claim of innocence. And the jury never heard a key alternate explanation for the crimes because her counsel had agreed as a condition of retention by Darlie's family to protect a more plausible suspect, her husband, at the expense of Darlie's own defense. Darlie Routier now seeks to have her conviction and sentence vacated and a writ of habeas corpus issued because no court can have confidence in such a fundamentally tainted verdict.

---

[3] Ms. Routier retained forensic fingerprint analysis Glenn Langenburg in conjunction with her state habeas proceedings

## IV.   PROCEDURAL HISTORY

### A.   Trial Court

Darlie Lynn Routier was indicted for capital murder on June 28, 1996, in Dallas County, Texas, in connection with the June 6, 1996, death of Damon Routier.  On June 28, 1996, the court appointed Douglas Parks and Wayne Huff to represent Ms. Routier. Due to pre-trial publicity, a change of venue to Kerr County was granted on September 27, 1996.  On October 21, 1996, the court granted a motion to replace court-appointed counsel with Douglas D. Mulder, Curtis D. Glover, Richard C. Mosty, and S. Preston Douglas, Jr.  Ms. Routier was tried by a jury before the Criminal District Court No. 3 of Dallas County, Texas.  Jury selection commenced on October 21, 1996, and was completed on November 18, 1996.  The guilt phase of the trial began on January 6, 1997, and the jury returned with a verdict of guilty of capital murder on February 1, 1997.

On February 3, 1997, after hearing evidence during the penalty phase of the trial, the jury returned an affirmative answer to the special issue concerning future dangerousness and a negative answer to the special issue concerning mitigating evidence. Accordingly, under Texas law, Ms. Routier was sentenced to death.

### B.   Direct Appeal

In March of 1998, the Texas Court of Criminal Appeals held the trial court reporter, Sandra Halsey, in contempt for failing to complete the trial transcript, despite numerous extensions.  In April of 1998, Ms. Halsey filed the transcript with the Court of Criminal Appeals.  In October of that year, the Court ordered Judge Robert Francis to conduct an independent review of the transcript after Ms. Routier's appellate attorneys discovered over 30,000 discrepancies in the transcript.  Judge Francis found Halsey's

entire record to be so deficient that it had to be replaced entirely. Another court reporter, Susan Simmons, was appointed to prepare, certify, and file a new reporter's record using stenographic notes and Ms. Halsey's original transcript. The tapes used by Ms. Simmons, however, were often of poor quality and unauthenticated, and Ms. Halsey's notes were inaccurate and incomplete.

In April 1999, Ms. Simmons testified that she had reconstructed the transcript to the best of her ability. The record was delivered to the Court of Criminal Appeals in December of 1999. Over defense objections—including Simmons' refusal to certify the first fifty-four pages of Volume 10, which contained the notes of a hearing on October 21, 1996, at which Douglas Mulder was substituted as Ms. Routier's trial counsel—the Court issued an order finding that it had complied with all prior orders of the Court of Criminal Appeals and had satisfied Petitioner's objections on September 7, 2000.

The conviction and death sentence were affirmed by the Court of Criminal Appeals on May 21, 2003, in a published decision, *Routier v. State*, 112 S.W.3d 554 (Ct. Crim. App. 2003).

### C.    State Habeas Corpus Petition

Ms. Routier's state habeas corpus application was timely filed under applicable state law on July 12, 2002.

During the pendency of her state habeas corpus proceeding, Ms. Routier repeatedly moved the court for the right to access and test the evidence that she contends will prove her innocence, including the following:

- Expedited Motion for Access to State's Physical Evidence, May 29, 2002
- Renewed Request for Access to State's Evidence, July 2, 2002
- Post-Application Motion for Access to State's Evidence, July 17, 2002

22

- Second Renewed Request for Access to State's Evidence, July 29, 2003

- Motion for Reconsideration, November 3, 2003

- Motion for Forensic DNA Testing, November 4, 2003

- Renewed Motion for Testing of Physical and Biological Evidence and Request for an Evidentiary Hearing, January 23, 2004

The Court did not grant Ms. Routier's motions for access to any of the State's evidence, nor did the Court allow any sort of forensic testing.  The trial court issued its Findings of Fact on August 4, 2004, ruling that the petition should be denied.  The Texas Court of Criminal Appeals agreed, denying Ms. Routier's petition for a writ of habeas corpus on December 1, 2004.

**D.    Petitioner Will Request a Stay of These Proceedings Until the State Courts Resolve Her Pending DNA Testing Motions**

In connection with her state habeas corpus proceedings, Ms. Routier filed three motions that remain pending before the Criminal District Court No. 3 of Dallas County, Texas:  (1) Applicant Darlie Lynn Routier's Motion for Forensic DNA Testing, filed November 4, 2003, (2) Applicant Darlie Lynn Routier's Supplemental Motion for Post-Conviction DNA Testing, filed on January 28, 2005, and (3) Applicant Darlie Lynn Routier's Motion for Discovery Regarding Pre-Trial DNA Testing Results, filed on January 28, 2005 (collectively, the "DNA Motions").  The state trial court has not yet decided those motions, and the trial court judge has informed counsel for both Parties that he intends to resume proceedings regarding the DNA Motions in the near future.

Out of an abundance of caution, Petitioner is filing this Petition for Writ of Habeas Corpus less than one year after the Texas Court of Criminal Appeals denied her application for a writ of habeas corpus.  Nevertheless, proceedings regarding the DNA Motions are still ongoing in the state courts, and it is likely to be a significant period of

time before the pending motions are finally determined. Petitioner therefore respectfully submits that the time is not yet ripe for this Court to proceed to the merits of this Petition for Writ of Habeas Corpus by a Person in State Custody, and will move this Court to grant a stay of these federal habeas corpus proceedings until such time as the Texas courts finally determine the matters presented in the three pending DNA Motions.

## V.   CLAIMS FOR RELIEF

### A.   Darlie Routier Was Denied Her Sixth Amendment Right To Effective Assistance Of Counsel.

Trial counsel was constitutionally deficient in two respects: (1) representation was hampered by an unwaivable conflict of interest between Ms. Routier and the only other adult in the house at the time of the murders, her husband, and (2) trial counsel utterly failed to investigate or rebut the purported "staging" evidence that lay at the core of the State's case.

#### 1.   Trial Counsel's Divided Loyalties Between Darlie Routier And Her Husband Constituted Ineffective Assistance Of Counsel.

##### a)   Relevant Facts

Douglas Parks and Wayne Huff were the first attorneys appointed to represent Darlie Routier. Parks considered Ms. Routier's husband, Darin, a suspect and planned to introduce evidence against him at trial to create reasonable doubt about Ms. Routier's guilt. Affidavit of Douglas H. Parks ¶ 4("Parks Aff.").

Douglas Mulder represented Ms. Routier's husband and mother, Darlie Kee, during a show cause hearing on September 20, 1996, where the State alleged that they had violated a gag-order regarding Ms. Routier's upcoming trial. C.R.R. Vol. 8, pp. 7:3-6, 9-16. In a conversation with Darlie Kee and Darin Routier, Mulder informed them that Parks intended to implicate Darin in the crime as part of Petitioner's defense. Routier

Aff. ¶ 7; Kee Aff. ¶ 5.  When Darin and Darlie Kee learned of Parks' strategy, they

sought to replace him with counsel who would not accuse Darin.  Mulder "agreed that, if

hired to represent [Darlie], he would not argue as part of the defense that [Darin Routier]

was in any way responsible for the death of [his] children."  Routier Aff. ¶7; *see also* Kee

Aff. ¶ 5.  As a result of this promise, Darin and Kee asked Mulder to represent Ms.

Routier at trial.  On October 21, 1996, Douglas Mulder became counsel-of-record for Ms.

Routier, replacing her court-appointed attorney, Douglas Parks.  C.R.R. Vol. 10, p.

11:24-25.

Even without knowing about Mulder's agreement to suspend any investigation of

Darin, both Parks and counsel for the State believed Mulder to be incapable of

representing Ms. Routier because of a conflict of interest.  In an October 24, 1996 letter

to Mulder, Parks stated that "[he] continued to believe that Darin Routier was a possible

perpetrator of the offense."  *See* Parks Aff. ¶ 8.  In the same letter, Parks further advised

Mulder "that the court had not addressed the possible conflict of interest generated by

simultaneous representation of Darlie and Darin Routier."  *Id.*  Parks' concerns were

more than just mere conjecture.

On November 12, 1996, the State filed a Notice of Possible Conflict of Interest

with the trial court alleging that Mulder's previous representation of Darin created a

conflict of interest that jeopardized Ms. Routier's Sixth Amendment right to conflict-free

counsel.  C.R.R. Vol. 22, p. 2669.  The State filed the Notice to "make real sure" that

there was no constitutional violation since the State had found "some new evidence"

implicating Ms. Routier's husband.  C.R.R. Vol. 22, p. 2670:9-10.  That Notice stated in

relevant part that the "investigation was ongoing with regards to the analysis of physical

evidence [and r]ecent analysis of physical evidence suggests that Darin Routier may have participated . . . in the crime." CR.1A.56.  When the trial court addressed Ms. Routier in open court on November 12 and November 18, 1996 about the State's Notice, Mulder did not state on the record his opinion about whether a conflict existed.  C.R.R. Vol. 22, pp. 2669-70; C.R.R. Vol. 26, pp. 3322-23.

In addition to these warnings, Mulder was aware of several significant pieces of evidence implicating Darin Routier in the crime, including:  (1) his hair on the murder weapon, CR.1.A: 58:59, (2) the bloody sock found in the alley contained fibers from his bloody sneakers, RR.38:3127-8, 3144-5; CR.1A: 58, (3) inconsistent statements about his bloody jeans, HR.6: 488; Def.'s Ex. No. 5 at 3; Def.'s Ex. No. 3 at 3; RR.4: 124, (4) blood on his jockey shorts, Parks Aff. ¶ 4, and (5) his inconsistent statements and suspicious behavior at the crime scene and hospital.  Mulder failed to even investigate these leads.

Ignoring the evidence available to him and warnings of a conflict of interest, Mulder kept true to his word.  The only evidence that he introduced implicating Darin was not offered until the punishment phase of Ms. Routier's trial—when the information could no longer be used to harm Ms. Routier's husband because she had been convicted. *Compare* C.R.R. Vol. 42, pp. 4235:18-4334:9 (Mulder's non-adversarial questioning of Darin during the guilt phase of the trial) *with* C.R.R. Vol. 49, p. 5679:12-16 ("You know, it's curious to me, and I have never for a minute doubted the innocence of Darin Routier. But, you know, he of all people, had the most to gain here.  She had a couple of hundred thousand dollars worth of insurance on her.").

26

If Mulder had not been burdened by a conflict of interest, he would have learned that in the spring of 1996, Darin Routier was contemplating an insurance scam that involved staging a burglary of his residence. *See* Routier Aff. ¶ 3; R. Kee Aff. ¶ 2. Darin Routier asked his wife's stepfather whether he "knew of anyone who would agree to burglarize [his] home as part of an insurance scam." Routier Aff. ¶ 3; *see also* Kee Aff. ¶ 2. Darin Routier explained that "he and his family would be gone from the house and that the 'burglar' would come to the house with a U-Haul truck and remove 'gobs' of stuff from the house" which he would retrieve "after his insurance company paid off." Routier Aff. ¶ 2. Darin Routier has admitted that he had this conversation with Robbie Kee only days before the attack on his wife and children. *See* Affidavit of Richard Reyna ¶ 5 ("Reyna Aff."). Nor was this an isolated instance of Darin's willingness to engage in an insurance scam. Two years prior to the murders of his two children, Darin Routier arranged to have his Jaguar "stolen" so that he could collect the insurance proceeds. *See* Routier Aff. ¶ 2. That "crime" went without a hitch. *See* Routier Aff. ¶ 2 ("In 1994, I spoke to a person about my Jaguar automobile. In that conversation, I said that 'it wouldn't bother me' if the Jaguar was stolen. That person then stole the Jaguar.") Had Mulder taken even minimal additional investigative steps, he likely would have uncovered the above-listed evidence implicating Darin. *See, e.g.*, *Bigelow v. Williams*, 367 F.3d at 573-574 (6th Cir. 2004).

Darin's intent to stage a burglary at his house could have explained several items of evidence that the prosecution could not explain in its case-in-chief. First, there was the issue of a mysterious black car that numerous witnesses testified they saw in the neighborhood around the time of the attacks at the Routiers' home. *See, e.g.,* Testimony

27

of Barbara Jovell, C.R.R. Vol. 36, p. 2634:5-15 ("Q. Well, it was the earlier day she was

working, whatever day that was?  A.  Right.  But she saw, yes, she did see a black car in a

back alley.  And she, she—when he passed us by, really fast, or a black car passed us by,

she said she saw the black car in the back alley.  When she was in the garage, he was like

sitting and like waiting for somebody but he was looking into the garage.  Q.  Like he

was watching the house?  That's what your mother told you, wasn't it?  A.  Something

like that, yes."); Testimony of Karen Neal, C.R.R. Vol. 41, pp. 3996:21-3997:25 ("A.  I

came home from work about 3:00 o'clock in the afternoon, and I saw a small, black car

that was stationed right in front of my sidewalk.  Q.  Okay.  And how was that small,

black car parked in that area?  A.  It was against my curb, and the person in the car

seemed to be angled towards the Routier home.  Q.  All right.  And you told the jury that

he appeared to be focusing on the Routier house?  A.  Yes, sir.  Q.  Okay.  Did that strike

you as unusual?  Did you say anything to him or do anything or go in the house or -  A.

When I got out of my car to approach him, he sped off very fastly.").

Second, there was testimony regarding two suspicious men—one of whom fit

Darlie's description of her assailant—walking along a stretch of Darlock Road,

approximately a 10-minute walk from the Routier's home, sometime "after 2:00 o'clock

a.m. on June 6, 1996." Affidavit of Darlene Potter ¶ 2 ("Potter Aff.").  None of this

information was presented to the jury because defense counsel failed to pursue a line of

investigation to uncover such evidence.

### b)   Legal Basis For The Claim

When a defense attorney actively represents conflicting interests, the prejudice

prong of the *Strickland* test is presumed.  *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

The term "conflict of interest" means "a division of loyalties *that affected counsel's*

*performance.*" *Id.* at 172 n.5 (citations omitted) (emphasis added). "A conflict of interest

has detrimental effects on representation because of what it tends to prevent an attorney

from doing." *Rubin v. Gee*, 292 F.3d 396, 405 (4th Cir. 2002) (finding that trial counsels'

conflict of interest constituted ineffective assistance of counsel) (citing *Halloway v.*

*Arkansas*, 435 U.S. 475, 489-90 (1978)); *see also Sanders v. Ratelle*, 21 F.3d 1446, 1452

(9th Cir. 1994) ("the harm may not consist solely of what counsel does, but of what the

advocate finds himself compelled to refrain from doing, not only at trial but also during

pretrial proceedings and preparations"). In this case, defense counsel Mulder had divided

loyalties to Darlie Routier and Darin Routier. As a result, his assistance to Darlie Routier

was ineffective.

Mulder suffered from two distinct conflicts: (1) he represented Darin Routier in a

matter substantially related to this case, and (2) he agreed not to pursue an obvious

defense strategy as a precondition to his representation. Each separately provides more

than sufficient basis for a finding of ineffective assistance of counsel.

### c)   This Error Is Not Harmless

The error is plainly not harmless. If Mulder had investigated Ms. Routier's

husband, the insurance scam would have been uncovered and presented to the jury. This

would have been more than sufficient to establish reasonable doubt as to the identity of

the killer, and undermines confidence in the jury's verdict.

### 2.   Defense Counsel's Failure To Investigate And Rebut Physical Evidence That Lay At The Center Of The State's Case Constituted Ineffective Assistance Of Counsel.

### a)   Relevant Facts

Ms. Routier's court-appointed counsel, Douglas Parks and Wayne Huff, retained

two forensic scientists, Terry Laber and Barton Epstein, to consult with the defense on

physical evidence.  *See* Laber Aff. ¶ 5.  Laber and Epstein had been given access to a

variety of crime scene evidence, including Ms. Routier's nightshirt, photographs of the

blood spatter in the garage and utility room, the garage window screen, and the bread

knife from which a fiber was recovered.  *See id. at* ¶ 5-6.  Laber and Epstein's

preliminary finding was that the evidence was consistent with Darlie Routier's testimony

that she and her sons had been attacked by an intruder, thereby contradicting the State's

theory that Routier had "staged" a crime scene.  *See id. at* ¶ 11; *see also* Affidavit of

Barton Epstein in Support of Petitioner Darlie Lynn Routier's Renewed Request for

Access to State's Evidence and Reply to State's Opposition ¶ 7 ("Epstein Aff.") ("At the

time that our work was stopped on the Routier case, our preliminary findings were that at

least some of the physical evidence we reviewed was *not* consistent with a staged crime

scene.") (emphasis added).

     Laber and Epstein recommended the testing of key physical evidence, including

the (i) bread knife, (ii) Ms. Routier's nightshirt; (iii) Hoover vacuum cleaner;

(iv) carpeting; (iv) Darin Routier's jeans; and (v) pillow and furniture.  Laber Aff. ¶¶ 6,

11-12.  Laber believed not merely that such testing was possible, but that it was

necessary:

> In my professional opinion, scientific testing of the physical evidence
> would have been critical to [Ms. Routier's defense].  Independent testing
> of that physical evidence was crucial to properly evaluate the State's case.
> There were numerous potential holes in the State's case that required
> testing to conform [sic] or refute the State's presentation of the evidence
> and to provide evidence that could well have refuted the State's forensic
> testimony.  These and other tests would have been critical to developing
> the physical evidence to refute the State's use of forensic and physical
> evidence and establish [Ms. Routier's] innocence.

*Id.* at ¶ 12.

In October of 1996, when Douglas Mulder replaced Parks and Huff, Mulder and his investigator had a perfunctory meeting with Laber to discuss the scientific analyses he and Epstein had conducted to date. *See Id.* Aff. ¶¶ 8-10. During the meeting, Laber provided a general overview of their work. *See id.* at ¶9. Mulder and his investigator asked virtually no questions about the work and generally were uninterested in Laber's analysis. *Id.* In total, the meeting lasted about <u>two hours</u>. *See id.* Laber expected that Mulder or someone from his defense team would follow-up with him because "the time in the introductory meeting was not sufficient time to explain in necessary depth the forensic significance of the analysis Barton Epstein and I had performed or had recommended be performed." *Id.* at ¶ 10. Laber did not hear from Mulder again, however.

At trial, the State presented the testimony of a number of expert witnesses who claimed that the crime scene had been "staged" by Ms. Routier. Charles Linch, an expert from the Southwestern Institute of Forensic Sciences ("SWIFS"), provided key testimony that microscopic debris recovered from a bread knife found in the kitchen at the Routiers' residence was "consistent" with material from the garage window screen and, therefore, likely was the instrument used to create the "T-shaped defect in it." C.R.R. Vol. 37, p. 2892:15. (Ms. Routier had testified that the intruder exited the house through that torn window screen.) Linch testified:

> Q.      Bottom line, from this comparison of the black rubbery material and the glass rods on the window screen and on this knife, what does that say to you as a trace evidence analyst?
>
> A.      I couldn't tell the difference between this debris and the debris found on the knife and, therefore, the knife could have been used to cause the cut, defect.

Q.      Okay.  It's certainly - are you saying that the material that you found on this knife blade is consistent with the material that makes up this screen right here?

A.      That's right.

Q.      You couldn't see any difference?

A.      That's right.

C.R.R. Vol. 37, pp. 2926:17-2927:6.

The State confirmed the significance of this testimony during its closing

argument:

> [W]hen [Linch] tested cutting that bread knife, he looked at it under the microscope and what did he find?  Glass rods, the same type of rubber material seen on the bread knife.  And that same type of rubber debris with the glass meshed in.  The same type of stuff that happens when you cut the screen.  And it adds up, that the bread knife was used to cut that screen, and Charles Linch found the evidence.  And that tells you they were trying to fake the crime scene.  You aren't going to have an intruder somehow get in the house and then take the knife out and then cut the window.

C.R.R. Vol. 45, pp. 5229:16-5230:2.

Tom Bevel, the State's blood expert, said he conducted several experiments to

determine the type of pattern a bloody knife would leave if it had been dropped by the

intruder when exiting through the garage.  When asked to compare a photograph of the

patterns created in his experiments with photographs of the crime scene, Bevel testified:

Q.      Now, looking at State's Exhibits 38-A through 38-D, Mr. Bevel, do you see any bloodstain pattern in any of these four photographs that correspond to the types of blood patterns that you saw during your test on November 26th, 1996?

A.      No, sir.

Q.      The blood drops that we see in 38-A through 38-D are they consistent or inconsistent with a bloody knife being dropped or thrown on to the utility room floor on June 6th, 1996.

A.      They would be inconsistent.

32

C.R.R. Vol. 38, p. 3297:7-17.

Again, the State confirmed the significance of Bevel's testimony during its closing argument. After reminding the jury that "defendant's testimony is that this man ran off with a knife and dropped it in the utility room," the State argued that Bevel's experiments demonstrated that "when you drop that knife, it leaves a mark, its leaves cast off. And you don't see any cast off or any mark left in that utility room. [T]hat let's you know that [Ms. Routier] is lying about that." C.R.R. Vol. 46, p. 5231:5-11.

Bevel offered additional significant testimony about experiments that he had conducted to determine the type of blood patterns that would be created on the clothing of the attacker. He stated:

> Taking a knife that was the same diameter of the knife in question, I just simply, in this case I went down to my knee after placing a clean T-shirt on my body, put blood on the knife, on both sides, again, held it up and allowed it to just simply stop its dripping . . . . And then just simply did a motion such as this, I think on the first time I did it with two swings, if you would, without adding any additional blood, to see if in fact we get the blood that would be on the back that would be consistent in size, direction, location as the blood in question on the T-shirt [worn by Ms. Routier on the morning of the attack].

C.R.R. Vol. 39, pp. 3357:10-3358:1. When asked to explain the significance of his findings, Bevel continued:

> I was able, multiple times, to get bloodstains that were the same size, location, with the long axis up and down in that area and on other areas of the back of the [test] shirt.

C.R.R. Vol. 39, p. 3357:3-6. During its closing argument, the State predictably told the jury that these experiments "tell[] you that she was stabbing, and Devon's blood winds up on her back. It's not going to wind up there as she is laying on the couch as the man wrestles at her neck." C.R.R. Vol. 46, p. 5233:14-16.

The State's witnesses also testified that unidentified fingerprints found on the crime scene belonged to Ms. Routier or the children. For example, retired Rowlett Police Office James Cron misleadingly told the jury that a bloody fingerprint on a table leading from the living to the kitchen lacked "sufficient points of identification" to identify but was "consistent with having been left by a five or six year old child." C.R.R. Vol. 35, p. 2270:9-10. Specifically, Cron testified:

> A.    That there is ridge detail, a few points of comparison, but I can't – couldn't make any identification.
>
> Q.    Okay. Same thing as you had with the other sets that I have just shown you?
>
> A.    Yes. These are better prints but still lacked sufficient points of identification.

C.R.R. Vol. 35, p. 2269:9-15. The State then invited the witness to speculate as to the source of the latent prints:

> Q.    Okay. How would you classify the size of these two latents?
>
> A.    Small.
>
> Q.    Okay. What do you mean by small? What would that be consistent with?
>
> A.    A juvenile, it could be. It fits the criteria to be a younger person's prints.
>
> Q.    Okay. What are those criteria?
>
> A.    Small ridges.
>
> Q.    Let me just ask you: The two prints here, 85-I and J, would they be consistent with having been left by a five or six year old child?
>
> A.    It's possible, yes, sir.

C.R.R. Vol. 35, pp. 2269:24-2270:10.

34

Trial counsel, having fired the forensic experts, presented no evidence to contradict any of the State's staging evidence. This fact was not lost on the State or the jury. During its closing argument, the State highlighted to the jury that defense counsel presented no contrary scientific evidence because he had none:

> [W]e know that back in August of last year, that there was an expert by the name of Bart Epstein, a trace evidence analyst there at SWIFS on behalf of the defendant. And we know that back there in August that Charlie Linch said, "Here, I will show you everything that I am doing out here." He let him look at the slides, let him examine the evidence. Basically, he looked over Charlie Linch's shoulder and graded his work out there at SWIFS. And don't you know, don't you know, that if Bart Epstein had any disagreement whatsoever with the findings of Charles Linch, that you would have seen him up here on this witness stand? . . .
>
> You know, here is the bottom line on Tom Bevel. You know out there at SWIFS there is another expert, Terry Labor. He is the DNA blood spatter expert who went out there on behalf of the defendant also, along with Bart Epstein. And if they want to quarrel with Tom Bevel and tell you that he is wrong, and that he is a witch doctor of some sort, where is Terry Labor then? Where is their blood spatter expert? Don't you know that if he had any criticism of the opinions rendered by Tom Bevel, that just like Bart Epstein, you would see them right up here, and he would be detailing for you what those criticisms are. But he is not here either, is he? And for a very good reason.
>
> There is one other thing that we need to ask also. Where are the samples from the T-shirt taken by Terry Labor? Where are they? You remember those first dibs samples that Terry Labor took from the defendant's T-shirt back in August? Before Tom Bevel even had a chance to look at the T-shirt. Terry Labor, the defendant's expert, went to Dallas and was given an opportunity to take several samples from that T-shirt. Did you see those samples in this courtroom at any point in this trial? No, you didn't. Don't you wonder why? You really don't have to wonder long about that question. It's obvious to you.

C.R.R. Vol. 46, pp. 5338:17-5339:4, 5340:3-5341:4. Such inflammatory and misleading arguments obviously were intended to and did lead the jury to reject Ms. Routier's intruder testimony. As even the State's expert has acknowledged: "[I]t is my professional opinion[,] that if Bart Epstein and Terry Laber were released from their

retention as expert witnesses for Darlie Routier's defense, such release constituted a grave error on the part of Darlie Routier's defense counsel." *See* First Affidavit of Charles A. Linch ¶ 10 ("Linch Aff.").

As forensic experts Laber and Epstein had observed, "numerous pieces of physical evidence we reviewed that were *not* consistent with a staged crime scene," Laber Aff. ¶ 11 (emphasis added), and the State's "staging" evidence *could* have been rebutted, had trial counsel tried to do so.  For example, defense experts could have testified that the blood stains on the back of the nightshirt Ms. Routier wore were *not* "cast-off" from a stabbing motion.  Experts would have been able to show that the source of fiber on the kitchen knives was debris from the fingerprint brush and powder used, first, to dust the window screen and, then, the knives found in the kitchen.  *See* Affidavit of Samuel Palenik In Support Of Petitioner Darle Lynn Routier's First Application For Post-Conviction Writ of Habeas Corpus Pursuant To Texas Code Of Criminal Article 11.071. ¶ 10; Second Affidavit of Charles A. Linch ¶ 7 ("Second Linch Aff.") (admitting that Knife Number 4 was dusted with fingerprint powder before he tested it).  But defense counsel never pursued this or other available scientific analysis to test Linch's microscopic examination of the origin of the fiber.

Contrary to the State's theory that the vacuum cleaner was pushed around by someone bleeding as part of staged crime scene, Laber and Epstein had concluded that most of the bleeding had occurred *after* the vacuum cleaner had been knocked down.  *See* Laber Aff. ¶ 11a. Contrary to the State's theory that a wine glass had been removed from the wine rack and thrown onto the floor to make it appear as if a struggle had occurred as part of staged crime scene, Laber and Epstein concluded that "the placement of shards of

glass below the location of the wine glasses indicated that the wine glass had broken while still in the rack and was not consistent with a person smashing or throwing the glass onto the floor." *Id.* at ¶ 11b. Contrary to testimony by Linch that hair found in the torn garage window screen was "microscopically identical" to Ms. Routier's hair, DNA testing had ultimately determined that the hair found in the screen belonged to Police Officer Sarah Jones. *See* Charles Linch Testimony, C.R.R. Vol. 37, pp. 2965:22-2966:2 ("Q. And so, what that shows is, that your microscopic evaluation, although done with the highest technology and with the greatest expertise, later proved, or it was later proved that that head hair was not in fact Darlie Routier's? A. That's right."). Contrary to testimony by Linch that "four defects" in the right shoulder of Ms. Routier's nightshirt were "hesitation" punctures that Ms. Routier made when she inflicted her own neck injuries, Laber would have testified that the location of those cuts meant that they could not have been made by Ms. Routier. *See* Laber Aff. ¶ 6c. Contrary to Cron's testimony that a bloody fingerprint leading out of the living room belonged to a child, trial counsel could have presented testimony that the fingerprint could not have belonged to a child. Yet, significantly, none of this evidence was in fact presented, let alone investigated.

### b) Legal Basis For The Claim.

Defense counsel has "a duty to garner the expertise necessary to cross examine [the State's expert]," including the duty of investigation. *Richey v. Mitchell*, 395 F.3d 660, 684 (6th Cir. 2005) (internal quotations omitted); *see also Strickland v. Washington*, 466 U.S. 688, 691 (1984) (duty to investigate). Where counsel chooses to forego his duty to investigate, the Supreme Court has stated, such a choice is "reasonable" only "to the extent that reasonable professional judgments support the limitations on investigations." *Strickland*, 466 U.S. at 691. "In other words," the Court clarified, "counsel has a duty to

make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* Similarly, a decision to forgo the presentation of expert testimony is "reasonable" only where an "investigation leading up to the decision not to call [the expert witness] . . . was itself reasonable.'" *Soffar v. Dretke*, 368 F.3d 441, 477 (5th Cir. 2004) (quoting *Wiggins v. Smith*, 539 U.S 510, 523 (2003)).  Where scientific testing is required to determine the viability of a defense and defense counsel has failed to undertake that testing, courts have held that "an actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results." *See Soffar*, 368 F.3d at 474; *Richey*, 395 F.3d 685 (quoting *Soffar*).

Defense counsel Mulder's failure to investigate and rebut the State's staging evidence constituted ineffective assistance of counsel. This evidence was key to the prosecution—if disproven, Ms. Routier could not have been the murderer. Mulder's predecessor had retained defense experts, who had identified numerous pieces of physical evidence that contradicted the State's theory of the crime scene. Yet Mulder, after being briefed by one of the experts for only two hours—clearly not "reasonable" investigation—failed altogether to (i) retain or present the testimony of the existing or any forensic experts; (ii) undertake or facilitate the testing of any physical evidence; and (iii) otherwise rebut the State's scientific evidence before the jury. Through his inaction, Mulder abdicated his "function . . . to make the adversarial testing process work." *Strickland*, 466 at 690 (emphasis added). This plainly violated Ms. Routier's Sixth Amendment right to counsel.

Ms. Routier was prejudiced by Mulder's failure to investigate and rebut the State's staging evidence. *United States v. Cronic*, 466 U.S. 648, 659 (1984) (prejudice is

38

presumed where "counsel entirely fails to subject the prosecution's case to meaningful

adversarial testing").  The only explanation of physical evidence presented to the jury

was the State's; accordingly, the jury had no option but to accept the State's flawed

analysis.  As even the State's expert has acknowledged:

> [F]urther forensic testing on this evidence would have been appropriate in
> order to <u>adequately investigate</u> the factual bases of the prosecution's
> theories.  Specifically, it is my professional opinion that if Bart Epstein
> and Terry Laber were released from their retention as expert witnesses for
> Darlie Routier's defense, such release constituted a <u>grave error</u> on the part
> of Darlie Routier's defense counsel.

Linch Aff. ¶ 10 (emphases added).  Mulder's release of Laber and Epstein—and failure to

consult any other expert in their place—"undermine[d] confidence in the outcome,"

thereby prejudicing Ms. Routier.  *Soffar*, 368 F.3d at 478.

### 3. Defense Counsel's Failure To Investigate Darlie Routier's Husband Constitutes Ineffective Assistance Of Counsel.

Mulder also failed to investigate numerous leads suggesting that Daring Routier

had arranged the June 6, 1996 attack on his residence.  Mulder's failure to investigate

was unreasonable under *Strickland* and constituted an independent violation of Ms.

Routier's Sixth Amendment right to counsel.  *See Loyd v. Whitley*, 977 F.2d 149, 157

(5th Cir. 1992) (failure of defense counsel to pursue a crucial line of investigation in a

capital murder case constitutes ineffective assistance of counsel).  "[I]t does not

invariably suffice that a lawyer make *some* efforts to investigate a case; the proper

inquiry is "whether the known evidence would lead a reasonable attorney to investigate

further."  *Bigelow v. Williams*, 367 F.3d 562, 574 (6th Cir. 2004).

Mr. Mulder knew that Darin Routier was possibly involved in the deaths of his

sons, yet he did not investigate or present any evidence implicating Mr. Routier.  When

Mulder took over for Parks and Huff, they specifically advised him of Darin Routier's

possible involvement.  By letter of October 24, 1996, Douglas Parks advised Douglas
Mulder of a possible conflict because he concurrently represented Darin Routier.  *See*
Parks Aff. ¶ 8.  Mr. Parks sent the letter because "Mr. Mulder had suggested . . . that he
was not yet fully familiar with all aspects of the case."  *Id*.  Among other things, Parks
explained to Mulder that "[he] continued to believe that Darin Routier was a possible
perpetrator of the offense."  *Id*.

Physical evidence available to Mulder further suggested Darin Routier's
involvement.  For example, the blue jeans that Darin Routier was wearing at the time of
the murders contained considerable blood staining consistent with contact type blood
staining.  *See* Laber Aff. ¶ 12f.  Two areas on the blue jeans also contained blood spatter
which suggests that Darin Routier was present at the time of the stabbings.  *See id*. at
¶ 12f.  In light of this evidence—and the information conveyed by Parks—reasonable
defense counsel at least would have investigated, if not pursued, a defense strategy that
implicated Darin Routier or someone known to him.  Mulder did not do either.

Had Mulder investigated Darin Routier, he would have learned significant facts
helpful to Ms. Routier's defense.  Undersigned counsel has learned through simple
investigation, for example, that in the spring of 1996, Darin Routier was contemplating
an insurance scam that involved staging a burglary of his residence.  *See* Routier Aff. ¶ 3;
Kee Aff. ¶ 2.  Darin Routier asked Ms. Routier's stepfather whether he "knew anyone
who would agree to burglarize [his] home as part of an insurance scam."  Routier Aff.
¶ 3; *see also*  Kee Aff. ¶ 2.  Mr. Routier explained that "he and his family would be gone
from the house and that the 'burglar' would come to the house with a U-Haul truck and
remove 'gobs' of stuff from the house" which he would retrieve "after his insurance

company paid off." *Id.* Darin Routier has admitted that he had this conversation with Robbie Kee only days before the attack on his wife and children. *See* Reyna Aff. ¶ 5. Moreover, two years prior to that attack, Darin Routier arranged to have his Jaguar "stolen" so that he could collect the insurance proceeds. *See* Routier Aff. ¶ 3; Holly Becka, *Routier Defense Theory Is Revealed*, Dallas Morning News (June 22, 2002). That "crime" was executed by a person known to Darin Routier. *See* Routier Aff. ¶ 2.

In light of Darin Routier's intention in 1996 to stage a burglary at his house, the mysterious black car that numerous witnesses testified they saw in the neighborhood around the time of the attacks at the Routiers' home constitued additional exculpatory evidence. *See, e.g.,* Testimony of Barbara Jovell, C.R.R. Vol. 36, pp. 2560:22-2561:22; Testimony of Karen Neal, C.R.R. Vol. 41, pp. 3996:8-3998:1. The same is true of the Rowlett woman who "after 2:00 o'clock a.m. on June 6, 1996" observed two suspicious men—one of whom fit Ms. Routier's description of her assailant—walking along a stretch of Darlock Road that was approximately a 10-minute walk from the Routiers' home. Potter Aff. ¶ 2. But none of this information was presented to the jury because Mulder failed to pursue a line of investigation to uncover such evidence.

The above facts are more than sufficient to establish that Ms. Routier was denied effective assistance of counsel for defense counsel's failure to investigate Darin Routier. In turn, no evidence implicating Darin Routier or his associates was presented to the jury. Mulder's failure to do so clearly prejudiced Ms. Routier and necessarily undermines confidence in the jury's verdict.

**4.    Trial Counsel's Failure To Object To Character Assassination And Use Of Inadmissible Expert Testimony Constitutes Ineffective Assistance Of Counsel**

In Section V.B, *infra*, this Petition contends that Darlie Routier was denied her due process rights under the Fourteenth Amendments because of the State's use of character evidence and the use of the inadmissible "expert" testimony of medical personnel and crime scene technicians. While defense counsel failed to object to the admission of some of this evidence at trial, the record will show that such claims are not procedurally barred because the State Habeas Court reached the merits of all of these claims, without regard to any failure to object. Nevertheless, to the extent that this Court should find such claims to be procedurally barred because of trial counsel's failure to object, we contend, in the alternative, that such failure constitutes a violation of Ms. Routier's Sixth Amendment right to effective assistance of counsel.

**B.    The Routier Trial Was So Infected With Unfairness That Ms. Routier Was Denied Her Fourteenth Amendment Rights To Due Process.**

**1.    Relevant Facts**

**a)    The State's Tactic Of Character Assassination Inflammed The Passions Of The Jury And Unfairly Prejudiced Ms. Routier.**

As detailed in the Statement of Facts, *infra* Section III.C.2 at 15-18, the trial record is replete with examples of character assassination. From its opening statement, the State made clear its intention to improperly ground its case on "character conformity" attacks by stating that "the real Darlie Routier" was "a *self-centered* woman, a *materialistic* woman, and a woman *cold enough, in fact, to murder her own two children*." C.R.R. Vol. 28, p. 23-32:1 (emphases added). And the State continued its assault on Darlie by parading a host of witnesses who did not approve of the way that

Darlie dealt with the horrible loss of her children, as if there was a "right" way to grieve the loss of two young boys.

Perhaps the most inflammatory piece of evidence introduced at Ms. Routier's trial was a videotape of a local news broadcast of the graveside birthday party that occurred on June 14, 1996, what would have been Devon Routier's seventh birthday. In the videotape, Ms. Routier is shown singing "Happy Birthday," shooting Silly String, chewing gum, and laughing. *See* State's Exhibit 101.

The State claimed that it introduced the tape to "give . . . insight into this woman." *See* C.R.R. Vol. 46, pp. 5238:23-5239:1 (objections to the video tape and judge's ruling). In fact, the portions of the video presented to the jury were out of context. The full videotape, filmed secretly by the Rowlett Police Department on June 14, 1996, showed a solemn prayer service held earlier in the day and attended by Darlie and her family. More importantly, it showed that Darlie's family, not Darlie, orchestrated the birthday celebration and brought the party favors and balloons to the grave site. The secret police surveillance tape also shows Ms. Routier as just one of many people engaging in various activities at the grave site, that included not only a very brief birthday celebration with children, family, and friends present, but also mourning and remembering the children. The rough timeline for the events on the video (as shown on the video timer rather than the actual time) is as follows:

- Family members decorate the gravesite and Ms. Routier's sister speaks to Devon's and Damon's graves telling them that she bought Silly String and snaps for them. (~ 8:00 min.).

- Gathering for prayer service. (~22:00 min.)

- Prayer service followed by lengthy and quiet gathering of family and friends. (~34:00 min.)

- More family and friends begin to arrive at gathering for birthday party. (~1:41.00 hr.)

- Birthday celebration. (~2:03 hr.)

- News interview begins. (~2:04 hr.)

- News interview ends; the Routiers, friends and family remain at the site discussing various matters, including reminiscing about the Routier children. (~2:30 hr.)

- A person who appears to be Ms. Routier's sister states that she obtained Silly String and "poppers" for the boys. (~3:52 hr.)

The jury was left with only one possible conclusion—that the vignettes of Ms. Routier shown in the news videotape selected by the State represented how she mourned her children. That type of character assassination was patently unfair to Ms. Routier.

### b)   Repeated Use Of Inadmissible Medical "Expert" Testimony Substantially Prejudiced Ms. Routier.

The State introduced inadmissible "expert" testimony regarding Darlie's state of mind after the murders. This testimony came from medical support personnel who were not qualified to render such opinions, and who spent very short periods of time observing Darlie in the hospital recovering from her wounds. None of these witnesses were proffered as an expert trained in judging the response of others to tragic circumstances, none knew Ms. Routier's ordinary demeanor or how she normally reacts to trauma, and none claimed to have treated other mothers who were injured at the same time their children were murdered. Indeed, none would have been qualified as an expert under *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). The prosecution's use of this testimony was intended to show that because she did not act in a hysterical manner, Ms. Routier must have killed her children—a point the prosecutor would

ultimately drive home to the jury in closing argument.  C.R.R. Vol. 46, pp. 5236-5239.

The medical support personnel testified as follows:

- Santos, one of the attending physicians, was permitted to testify that "most of the time mothers" when they are made aware, or told that a child has died, "get hysterical."  C.R.R. Vol. 30, p. 748:19-21.  He further testified that "they cry" and "usually tell me I am wrong."  C.R.R. Vol. 30, p. 749:3.  He testified that there is a "lot of anger and a lot of pain."  C.R.R. vol. 30, p. 749:23.  He said that "as far as all the mothers [he had] ever dealt with in this same situation," he had not seen anyone react with a "flat affect" as Ms. Routier did.  C.R.R. Vol. 30, pp. 750:25-751:1.

- Jody Cotner, a nurse supervisor, was permitted to testify that Ms. Routier "was kind of withdrawn" and "didn't cry very often," that she "wasn't very emotional" and that this was "not the emotions that you usually see with a mother."  C.R.R. Vol. 31, p. 1043.

- Denise Faulk, a nurse who had attended to Ms. Routier on the night of the 7th of June, was allowed to testify that she had "dealt with people before that have lost loved ones, or close relatives."  In response to the question "Did Darlie Routier's reaction differ from what you had seen in your experience?" she was allowed to opine that "it was different in that she didn't portray those characteristics."  C.R.R. Vol. 32, pp. 1210:25-1211:3.

    As a result of the unobjected to admission of this damaging and irrelevant

testimony, the prosecutor was allowed to argue:

> You remember Dr. Santos told you that, of course, he checked on her.  He deals with this situation all the time.  People that have been seriously injured, people that lose their relatives, I mean, that is part of his job.  He said he was expecting her to go crazy.  Mothers, many times when they lose their children, they don't accept that fact.  They want to know where they are.  They won't accept it when you tell them they are dead.  But not this woman.  She wasn't of the demeanor he thought she would be.  Flat affect is what he called it.  Flat affect.

C.R.R. Vol. 46, pp. 5217:19-5218:5.

> Jody Cotner, who is the trauma coordinator . . . .  She had been there 11 years.  One of her jobs is to work with people, to inform people that their loved one has died.  She has had to do that hundreds of times.  She has had to deal with mothers that lose their children, and what did she tell you?  There is nothing like it.  The bond between a mother and a child.  A grief that is inconsolable.  They do it in different ways, but they all show it.

And she never saw that reaction from this woman. Never saw the reaction she has always seen before. The same with the other nurses who deal with this stuff every day. They have never seen a reaction like that. It was more of a whining, no real tears, I think you-all know what they are talking about now, now that all of the evidence is in.

C.R.R. Vol. 46, pp. 5220:16-5221:7.

### c)   Repeated Use of Inadmissible "Expert" Testimony On Crime Scene Analysis Substantially Prejudiced Ms. Routier.

A significant part of the prosecution's case consisted of "expert" testimony on crime scene analysis that should have been rejected on the grounds that it failed to meet the *Daubert* test for expert testimony. These opinions were supported by no empirical studies, were unverifiable, and were based on a "methodology" that was incapable of being challenged because the testimony was based purely on his subjective instincts. Former police officer James Cron, for example, was permitted to testify as follows concerning his "big picture" impression of the crime scene:

- After a 25-30 minute initial walk-through of the crime scene, Cron had formed a belief that "there had not been an intruder entry through the window." C.R.R. Vol. 34, p. 2197:2-3. When asked by the prosecutor why he formed this opinion after his initial walk-through, Cron said only that "[i]t's sort of a big picture. It's not any one thing. It was the overall scene which, primarily, is the lack of evidence in many cases. But the entire scene indicated to me there had not been an intruder. There wasn't any one object or any one situation there." C.R.R. Vol. 34, p. 2197:9-14.

- When Cron was asked to summarize the factors he used in reaching this opinion, his testimony revealed that what he had testified to was not fit for expert testimony because, in his own words, "[t]his is all common sense." C.R.R. Vol. 35, p. 2421:7.

- Cron was also allowed to provide his subjective opinion that a glass from the wine rack in the Routier kitchen that was broken at the crime scene was not dislodged by an intruder but instead that, "it looked to me like it had been broken there to simulate or stage an offense, a member of the household broke it and planted it there." C.R.R. Vol. 25, p. 169.

46

- Finally, Cron was allowed to summarize his opinion as follows: "in my opinion, no intruder committed these offenses." C.R.R. Vol. 25, p. 203:10-11.

The subjective opinion of FBI Special Agent Alan Brantley was also admitted

without a *Daubert* hearing. C.R.R. Vol. 40, p. 3617:1-7 (indeed, the Court amazingly—

and incorrectly—held that *Daubert* "has no bearing on a criminal case"). Brantley

offered his opinion that "in this particular case, and this particular crime scene, that this

crime scene had been staged, and in all likelihood whoever killed both Devon and

Damon, was someone that they knew, and someone that they knew very well." C.R.R.

Vol. 40, p. 3661:11-15. It is highly unlikely that such testimony would have passed a

*Daubert* test, had the court correctly understood that it applied. Agent Brantley himself

noted that his analysis consists of "be[ing] aware of the obvious," C.R.R. Vol. 40, p.

3738:11, that "[i]t[] take[s] no behavioral scientist, or no rocket scientist to come in here

and talk about those kinds of things," C.R.R. Vol. 40, p. 3688:20-22, and that it is nothing

more than noting the characteristics of the victim, reading the police reports and evidence

from the crime scene, and drawing logical conclusions from that information. C.R.R.

Vol. 40, pp. 3661-3663.

### 2.    Legal Basis For The Claim

Errors in the management of a state criminal trial will result in a denial of due

process where "they are so harmful to the cause of truth that, singly or cumulatively, they

make the defendant's conviction fundamentally unfair." *Bell v. Duckworth*, 861 F.2d

169, 170 (7th Cir. 1988). The prosecutor's theory of the case, that Ms. Routier was cold

and materialistic enough to murder her own children, was a direct assault on the

"fundamental rule of evidence . . . that a defendant's 'bad character' cannot be used to

argue that the defendant committed the crime for which he is being tried, or had the

propensity to commit that crime." *Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000) (noting that a prosecutor who dwells on a defendant's alleged bad character in this prohibited manner may be found to have engaged in prosecutorial misconduct).

Here, this error was compounded by the introduction of "expert" opinion that is nothing more than a subjective opinion. *See, e.g., Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) (emphasis added) (when "[an] expert witness brings to court *little more than his credentials and a subjective opinion* this is not evidence that will support a judgment.").

### 3.    Ms. Routier Was Deprived Of A Fair Trial

Almost all of the State's evidence falls into one of these three impermissible categories:  (1) the character assassination of Darlie Routier, (2) so-called "expert" testimony about Darlie's demeanor after the murders, and (3) purportedly expert testimony that was introduced to demonstrate that the crime scene was "staged."  If all of the evidence falling into these three categories had been excluded—as it should have been—the State would have been unable to survive a motion for a directed verdict.  The remaining evidence would have shown that Darlie herself had been severely wounded, that her home had been left in disarray, and that an attacker left a bloody sock in an alley far from the site of the attacks.  These errors caused Ms. Routier's conviction, depriving Darlie Routier of her right to Due Process.

### C.    The Cumulative Impact Of The Ineffective Assistance Of Counsel And the Fundamental Unfairness Of The Trial Violated Ms. Routier's Due Process Rights.

As set forth in detail above, Ms. Routier's conviction was the product of irrelevant and inflammatory evidence.  The majority of the evidence that was presented— or presented and not rebutted—was the result of either the constitutionally deficient

performance of Ms. Routier's trial counsel or impermissible character evidence and "expert" testimony proffered by the State.  Taken as a whole, these errors so infected Ms. Routier's trial as to undermine all confidence in the verdict.

### 1.   Relevant Facts

The State's case against Ms. Routier was entirely circumstantial.  The only true evidence against her consisted of the following:  Ms. Routier, although herself attacked, was in the room at the time of her boys' murders.

The remainder of the State's case consisted of a combination of improper character attacks and questionable physical evidence designed to demonstrate Ms. Routier staged the crime scene and murdered her own sons.  As discussed in Section V.B, *supra*, Ms. Routier's trial was infected with the following due process violations:

- The State repeatedly presented evidence of Ms. Routier's bad character to show she had the propensity to commit the crime (*see* Section V.B.1);

- The State proffered testimony of multiple medical support personnel who offered improper expert conclusions regarding Ms. Routier's state of mind after the murders (*see* Section V.B.2);

- The State introduced "expert" testimony on crime scene analysis that should have been, and was not, stricken on *Daubert* grounds (*see* Section V.B.3); and

- The due process violations that ran throughout Ms Routier's trial were compounded by the ineffectiveness of her trial counsel, who not only failed to present rebuttal witnesses to contradict the State's theory of a staged crime scene, but <u>dismissed</u> two experts who could do so.  *See* Section V.A.2, *supra*.  Trial counsel's conflict of interest also prevented him from introducing a plausible version of the attack – that Ms. Routier's husband was implicated in the crime.  *See* Section V.A.1, *supra*.  Taken separately, these errors are constitutional violations worthy of habeas relief.  Taken together, there can be absolutely no confidence in the verdict rendered against Ms. Routier.

### 2.   Legal Basis For The Claim

Federal habeas corpus relief may be granted for cumulative errors in the conduct

of a state trial where those errors "so infected the entire trial that the resulting conviction

violates due process." *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (citing

*Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01 (1973)).  The Fifth Circuit

also requires that:  1) the individual errors involve matters of constitutional dimension;

and 2) the errors were not procedurally defaulted for habeas purposes.  *Id*. at 1454, 1458.

When considering claims of cumulative error, the reviewing court "must review the

record as a whole to determine whether the errors more likely than not caused a suspect

verdict."  *Id*. at 1458.

Here, the jury's verdict against Ms. Routier was the result of prejudicial evidence

of marginal, if any, value that infected Ms. Routier's entire trial.  The deficient

performance of Ms. Routier's trial counsel, as well as the numerous incidents of abusive

character evidence and the questionable expert testimony introduced by the State,

constitute independent constitutional errors that infected Ms. Routier's trial.  Taken as a

whole, these errors so infected Ms. Routier's trial as to constitute a violation of her right

to due process.

### D.   Darlie Routier Is Innocent of the Crime For Which She Was Convicted.

#### 1.   Ms. Routier Has Introduced Evidence of Actual Innocence That Exceeds the Gateway Standard Under *Schlup v. Delo* and Is Therefore Entitled To Relief For The Specific Constitutional Violations In Her Case.

Ms. Routier has already introduced significant post-trial evidence of her actual

innocence:

- A bloody fingerprint left on Ms. Routier's glass sofa table the night of the murders has been conclusively determined not to belong to anyone in the

Routier household.  The State's witness testified at trial that the print was
consistent with having been left by a five or six year old child.  The State's
post-conviction fingerprint expert concluded, however, that he was able to
exclude all possible known sources of this print except Ms. Routier
herself.  Two separate fingerprint experts have definitively excluded Ms.
Routier as the source of this print.

- Ms. Routier has also been excluded as the source of a bloody fingerprint
  left on her utility room door – the same door through which she claims her
  attacker fled.  This fingerprint was not introduced at trial.

- Evidence introduced by the State at trial to show Ms. Routier staged the
  crime scene – including blood spatter stains on Ms. Routier's night shirt,
  blood stains left by a vacuum cleaner, a broken wine glass, and fibers
  found in a kitchen knife – has been shown to be mistaken, scientifically
  false, or otherwise insupportable by forensic scientists Terry Laber and
  Barton Epstein.  Laber and Epstein were retained by Ms. Routier's court-
  appointed counsel and dismissed by her trial counsel, Doug Mulder.
  Consequently, Laber and Epstein were not able to complete their analysis,
  and none of their preliminary conclusions disproving the State's case were
  introduced at trial.  Laber and Esptein have been re-engaged in Ms.
  Routier's defense and, after further analysis, have substantiated their
  initial conclusion that the crime scene was not staged.

The scientific and physical evidence that has surfaced since Ms. Routier's trial seriously

undermines the credibility of her conviction.  Moreover, this evidence has been gathered

without any access to forensic or biological evidence in the State's possession; without

access to the State's notes underlying pre-trial DNA testing; and in the absence of any

factual discovery or evidentiary hearings at the state level.  Evidence of Ms. Routier's

innocence will only grow stronger as she is permitted discovery and further investigation

in light of discovery in these federal proceedings.

When a constitutional error—here, Ms. Routier's denial of her Sixth Amendment

right to effective assistance of counsel and her Fourteenth Amendment right to due

process – results in the conviction of one who is actually innocent, that conviction is not

entitled to the same degree of respect as a conviction that is the product of an error-free

trial.  *Schlup v. Delo*, 513 U.S. 298, 316(1995).  To establish that a constitutional

violation has probably resulted in the conviction of an innocent person, Ms. Routier must

show that "is it is more likely than not that no reasonable juror would have convicted

[her] in the light of the new evidence." *Id.* at 327. Ms. Routier's conviction differs

markedly from a case like *Herrera v. Collins*, 506 U.S. 390, 417 (1993), where the

petitioner's conviction is presumed to be free of constitutional error. *Schlup*, 513 U.S. at

315-16, (citing *Herrera*). Because an error-free trial necessarily instills more confidence

in the verdict, petitioners with *Herrera*-type claims must meet a higher standard of

review. *Id.*

The precise holding of *Schlup* applies only to cases in which a petitioner raises a

claim of actual innocence to avoid a procedural bar to the consideration of his other

constitutional claims. 513 U.S. at 315. *Schlup*'s more lenient standard, however, must

also apply to cases such as Ms. Routier's where the petitioner does <u>not</u> face such a

procedural bar, but Ms. Routier's flawed conviction is a direct result of the constitutional

errors underlying her claim for habeas relief. To find otherwise would yield an absurd

result: that only applicants whose habeas petitions suffers from a procedural defect could

avail themselves of the *Schlup* standard. Put differently, Ms. Routier would be penalized

for having a procedurally correct petition, because the analysis of Ms. Routier's actual

innocence claim would never come before this Court. Accordingly, Mr. Routier is

entitled to relief if she establishes that her Sixth and Fourteenth Amendment rights were

violated, but fails to establish sufficient specific prejudice accruing from any single

violation, because she can establish that "it is more likely than not that no reasonable

juror would have convicted [her] in the light of the new evidence." *Schlup*, 513 U.S. at

327, 155 S. Ct. at 867.

### 2. The Supreme Court's Pending Review of *House v. Bell* May Afford Ms. Routier With a Freestanding Claim of Actual Innocence.

The Supreme Court suggested in *Herrera* that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." 506 U.S. at 417. While several appellate courts have interpreted *Herrera* to create a claim of actual innocence in the absence of a constitutional error at trial,[4] the Fifth Circuit interprets *Herrera* as dicta and holds that newly-discovered evidence relating to innocence is an insufficient standalone ground for habeas relief. *Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir. 1998); *see also Willis v. Cockrell*, No. P-01 –CA-20, 2004 WL 1812698, *12 (W.D. Tex. Aug. 9, 2004).

The law regarding freestanding actual innocence claims under *Hererra*, however, is now in flux. On June 28, 2005, the Supreme Court granted certiorari based on the holding of a sharply divided Eighth Circuit panel that the petitioner, Paul House, had not met his burden of proof under either *Schlup* or *Herrera* in spite of House's introduction of compelling new evidence that substantiated his innocence claim. *House v. Bell*, 386 F.3d 668 (6th Cir. 2004) (en banc) (*cert. granted* 125 S.Ct. 2991) (June 28, 2005)). The Supreme Court certified the following questions for review:

> 1. Did the majority below err in applying [the Supreme Court's] decision in *Schlup v. Delo* to hold that Petitioner's compelling new evidence, though presenting at the very least a colorable claim of actual innocence, was as a matter of law insufficient to excuse his failure to present that evidence before the state courts – merely because he had failed to negate each and every item of circumstantial evidence that had been offered against him at his original trial?; and

---

[4]   *See, e.g., Jackson v. Calderon*, 211 F.3d 1148, 1164 (9th Cir. 2000), *cert. denied*, 531 U.S. 1072 (2001); *Milone v. Camp*, 22 F.3d 693, 699 (7th Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995).

2. What constitutes a "truly persuasive showing of actual innocence" pursuant to *Herrera v. Collins* sufficient to warrant freestanding habeas relief?

*See House v. Bell*, No. 04-8990, Petition for a Writ of Certiorari (2005 Westlaw 1527632) (March 3, 2005).

The Supreme Court's review in *House* may well provide Ms. Routier with a freestanding claim for actual innocence. As summarized in Section D.1, above, Ms. Routier has already introduced substantial post-trial evidence of her innocence, and has done so in the absence of access to critical evidence in the State's possession or any court-permitted discovery. This evidence alone – notwithstanding additional evidence that will likely surface through discovery – is sufficient for Ms. Routier to demonstrate she is innocent of her children's deaths.

## VI. ISSUES UNDER 28 U.S.C. §§ 2254 (d)(1), (d)(2), (e)(1) WITH RESPECT TO THE STATE COURT'S FINDINGS OF FACT AND ADJUDICATION OF THE CLAIMS

Under 28 U.S.C. §§ 2254(d) and (e), a federal habeas court must presume state court findings of fact to be correct and defer to state court determinations of claims, unless the findings of fact can be rebutted by clear and convincing evidence, § 2254(e)(1), and the determinations can be shown to be objectively unreasonable, § 2254(d)(1), or based upon an unreasonable determination of the facts in light of the evidence presented in state court proceedings, § 2254(d)(2). In the briefing that Ms. Routier will submit in the course of this litigation, she will demonstrate that the state court findings of facts with respect to all the claims presented herein can be rebutted by clear and convincing evidence. Ms. Routier will also demonstrate that the state court determinations of the claims presented herein are objectively unreasonable, or based upon

54

an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

In addition, Ms. Routier will demonstrate a more profound procedural problem with the state court proceedings – the abdication of the judicial function by the state habeas judge to the prosecutor. The state habeas judge performed no function independent of the prosecutor: he had reached no decision before asking the parties to draft findings of fact and conclusions of law; he never held a hearing where he played an active and inquiring role; he never provided guidance as to the results and points he wanted addressed in the final order; and he adopted without any material or substantive alteration the state's proposed findings and conclusions. This process deprived Ms. Routier of one of the cornerstones of due process – a fair resolution of the issues in her case by an impartial decisionmaker. Ms. Routier's decisionmaker was, in effect, her adversary, the district attorney. As such, nothing decided by the state habeas court can be given deference in this Court. To do so would be to inflict anew the due process violation already suffered by Ms. Routier.

## VII.   PRAYER FOR RELIEF

Wherefore, DARLIE LYNN ROUTIER prays that this Court:

A.   Order Respondent to provide this court with the record of all state court proceedings;

B.   Issue a writ of habeas corpus to have her brought before it, to the end that she may be discharged from her unconstitutional confinement and restraint and/or relieved of her unconstitutional sentence of death;

C.   Grant an evidentiary hearing so that she may present evidence in support of these claims; and

D.   Grant such other relief as law and justice require.

Dated:  November 29, 2005

Respectfully submitted,

*Richard Burr* — By permission,
R. Smith

Richard Burr
BURR & WELCH LLP
State Bar No. 24001005
412 Main Street, Suite 1100
Houston, Texas 77002
(713) 628-3391
(713) 893-2500 fax

Lauren Schmidt
BROWNSTEIN, HYATT & FARBER, P.C.
410 Seventeenth St.
Twenty-Second Floor
Denver, Colorado  80202-4437
(303) 223-1207
(303) 223-8007 fax

Michael Flanagan
Daniel A. Cantu
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., NW
Washington, D.C.  20036
(202) 955-8500
(202) 467-0539 fax

Richard Smith
LYNN TILLOTSON & PINKER LLP
750 North St. Paul St., Suite 1400
Dallas, Texas 75201
State Bar No. 24027990
(214) 981-3800
(214) 981-3839 fax

J. Stephen Cooper
Attorney-at-Law
State Bar No. 04780100
3514 Cedar Springs Road
Dallas, TX 75219
(214) 522-0670
(866) 840-3860 fax

*Attorneys for Petitioner*

56

VERIFICATION

Under penalty of perjury, I hereby declare that all the factual allegations made herein are true and accurate except for those allegations made upon information and belief.


Dated: _November 29, 2005_                _____
                                              Richard Smith

# CERTIFICATE OF SERVICE

I, Richard Smith, hereby certify that the foregoing petition, together with the exhibits, was served on the Attorney General for the State of Texas, Counsel for Respondent, by mailing the petition and exhibits on November 29, 2005, with first class postage affixed to:

> Gena Bunn, Esquire
> Chief, Postconviction Litigation Division
> P.O. Box 12548
> Austin, Texas  78711-2548

Richard Smith

1





3



STATE'S
EXHIBIT



